[Nos. 22343–7–I; 22344–5–I.   Division One.   April 16, 1990.]

THE STATE OF WASHINGTON, *Respondent*, v. MICHAEL JAMES
WALSH, *Appellant*.

*Lenell Nussbaum* of *Washington Appellate Defender Association,* for appellant.

*Norm Maleng, Prosecuting Attorney,* and *James M. Cline, Deputy,* for respondent.

PEKELIS, J.—Michael James Walsh, a juvenile, was charged with three counts of burglary in the second degree. He appeals his conviction of one count of burglary and two counts of the lesser included offense of criminal trespass. His principal contention is that the State failed to prove the unlawful entry element of these offenses because he was privileged to enter his mother's home.

I

Lucille Walsh had been experiencing discipline problems with her 16–year–old son, Michael Walsh. Ms. Walsh's job required her to travel, and Michael had "keg parties" while she was away. He also skipped school frequently and entertained friends at the house during the day. Michael threatened his mother physically on one occasion, and she felt she had no control over him.

These problems led to a confrontation between Ms. Walsh and Michael on October 20, 1987. Ms. Walsh could not remember her exact words, but testified that she asked Michael to leave the house and told him he was no longer welcome there. She also requested that Michael return his house key, but he did not do so. Ms. Walsh then left for work, leaving Michael in the house. She later had the locks on the house doors changed.

She made no alternate provision for Michael's care and did not give him any money. The record does not indicate whether Michael had any clothes or money, or any means of obtaining these things. Ms. Walsh testified that Michael was not absolutely prohibited from ever returning, but could return when he agreed to follow her rules.

While Ms. Walsh was away at work on the day of October 21, Michael entered the house through his bedroom window. He apparently showered, brushed his teeth and changed his clothes, leaving dirty clothes in his bedroom. This entry was the basis for one of the criminal trespass convictions.

Michael entered the house again on the day of October 22. The evidence indicates that, as before, he showered, brushed his teeth and changed his clothes. When Ms. Walsh returned home from work, she also found that $10 and an envelope containing some commemorative silver coins were missing from a drawer in her bedroom. The October 22 entry was the basis of the burglary conviction.

Around midnight on October 22, Michael returned and asked his mother to allow him to sleep in the house. She gave him a sleeping bag and allowed him to sleep on the patio. She left him sleeping there when she left for work the next morning.

That day, October 23, officers patrolling the area responded to a call regarding a burglary in progress at the Walsh residence. The officers discovered Michael in the house and placed him under arrest. Conducting a search incident to arrest, the officers discovered silver coins in Michael's wallet and back pocket. Ms. Walsh later identified these coins as the ones taken from her bedroom on October 22. The October 23 incident resulted in the second criminal trespass conviction.

The State filed an information which described the residence burglarized as "9553 Palatine Avenue North (Walsh residence)". At trial, Ms. Walsh testified that her address was "9558 Palatine Avenue N."

At the conclusion of the trial, the trial court found that Ms. Walsh gave Michael "an express order to move out of his mother's house at 9553 Palatine Avenue North, in King County." The court further found that Michael forcibly entered his mother's house on October 21, 22 and 23, and that he stole coins and dollar bills from within the house on October 22.

The trial court then found Michael guilty of the lesser included offense of criminal trespass as charged in the counts involving the October 21 and October 23 entries. The court found Michael guilty of burglary in the second degree as charged in the count involving the October 22 entry.

## II

Michael contends that the evidence is insufficient as a matter of law to support the offenses charged. He argues first that there is no evidence he entered the building at the address alleged in the information. He next argues that there is no evidence he entered the building at the address found by the trial court. The State contends that the information and the trial court's findings sufficiently identify the residence entered by Michael.

An information must contain "a plain, concise and definite written statement of the essential facts constituting the offense charged." CrR 2.1(b); *State v. Rhinehart,* 92 Wn.2d 923, 928, 602 P.2d 1188 (1979). An information is subject to attack if it is too indefinite or uncertain to enable the accused to prepare an adequate defense. *Rhinehart,* 92 Wn.2d at 928.

As far as the record on appeal shows, Michael did not attack the sufficiency of the information in the court below. A defendant may attack the sufficiency of an information for the first time on appeal, but a stricter standard of review applies. *State v. Smith,* 49 Wn. App. 596, 598, 744 P.2d 1096 (1987), *review denied,* 110 Wn.2d 1007 (1988). "Under these circumstances, . . . the information is immune from attack unless so obviously defective as not to

charge the offense by any reasonable construction." *Smith,* 49 Wn. App. at 598.

Here, it appears that the correct address of the Walsh residence is 9558 Palatine Avenue North and that the information incorrectly charged Michael with burglarizing 9553 Palatine Avenue North. However, the information specifically referenced the "Walsh residence." The information thus clearly informed Michael of what residence he was charged with burglarizing. We conclude that the information was sufficient to inform Michael of the offenses charged.

Michael next argues that his convictions must be reversed because there is no evidence he entered the building at the address found by the trial court. However, the trial court found in findings of fact 3, 4, and 5 that Michael "entered his mother's house," not that he entered a building located at a specific address. Michael has not assigned error to the finding that he entered his mother's house.[1] We therefore reject Michael's argument that the evidence is insufficient to support the trial court's findings.[2]

### III

Michael contends that the State failed to prove his entry into his mother's home was unlawful, arguing that the entry was privileged because his mother had a duty to provide him shelter and support. He further contends that his mother's failure to provide him shelter and support excuses the taking of money from his mother's bedroom. The State

---

[1]Michael does not assign error to findings of fact 3 and 5, and appears to challenge finding of fact 4 only insofar as it finds that he "stole coins and dollar bills from within the house."

[2]The trial court's only reference to a specific address is in finding of fact 2, in which the court found that Michael's mother gave him "an express order to move out of his mother's house at 9553 Palatine Avenue North." That this finding incorrectly gives the address of the Walsh residence does not affect the validity of the court's unchallenged finding that Michael entered his mother's house on October 21, 22, and 23.

contends that Ms. Walsh's express order that Michael stay out of the home terminated any privilege to enter. In the alternative, the State contends that any privilege Michael may have had did not extend to his mother's bedroom, and therefore, at the very least, his burglary conviction should be affirmed.

Entering or remaining unlawfully in a building is an element of both second degree burglary and criminal trespass, the offenses of which Michael was convicted. RCW 9A.52-.030(1); RCW 9A.52.080. Unlawful entry is defined in RCW 9A.52.010(3):

> A person "enters or remains unlawfully" in or upon premises when he is not then licensed, invited, or otherwise privileged to so enter or remain.

The court in *State v. Steinbach,* 101 Wn.2d 460, 679 P.2d 369 (1984) addressed the issue of whether a minor child's entry into the parental home was unlawful within the meaning of RCW 9A.52.010(3). In *Steinbach,* 14-year-old Terri had forcibly entered her mother's home after being placed in alternative residential placement under RCW 13.32A. The court first recognized that a child has a privilege to enter the parental home. *Steinbach,* 101 Wn.2d at 462–63. The court then held that an alternative residential placement order (ARP) under RCW 13.32A does not automatically terminate a child's privilege to enter the parental home. In contrast to the transfer of legal rights and duties which occurs when parental rights are terminated, a residential placement order has only a limited effect on the parent–child relationship. *Steinbach,* 101 Wn.2d at 463. Accordingly, the court held that an ARP must specifically state that a child's privilege to enter has been terminated in order to have that effect. *Steinbach,* 101 Wn.2d at 462–63.

Because neither Terri's mother nor the ARP had specifically prohibited her from entering the parental home, the court concluded that Terri remained privileged to enter

the home. *Steinbach,* 101 Wn.2d at 463–64.[3] The court expressly reserved the issue of "whether conviction for burglary is appropriate where either the alternative residential placement order or the parent expressly prohibits the child's return to the home." *Steinbach,* 101 Wn.2d at 464 n.1.

Here, Michael's mother asked him to move out of the family home and to return his house key. When Michael did not return his key, she had the locks on the house changed. Although Michael's mother's conduct thereafter was not unequivocal, this evidence supports the trial court's finding that Michael's mother gave him an express order to move out of the house. Thus, we address the issue reserved by the court in *Steinbach*: whether a parental order is sufficient to terminate a child's privilege to enter the family home.[4]

Whether a parental order should be effective to terminate the child's privilege to enter raises competing public policy concerns. Parents undeniably have an interest in preserving the security and tranquility of the family home from destructive, out–of–control teenagers. However, society has a comparable interest in ensuring that children are provided with basic needs, such as food, shelter and clothing.

---

[3] *Steinbach* was a 5–to–4 decision. Justice Dolliver, dissenting, objected vigorously to the requirement that an ARP contain express language prohibiting return to the family residence. He reasoned that such a prohibition is inherent in an ARP.

[4] Appellant contends that the issue reserved by the court in *Steinbach* was whether the express prohibition against entry could be in the ARP itself or in the *additional* express order of the parent. Appellant claims that the court's statement was not meant to imply that a parent's express prohibition could suffice without the existence of an ARP. The State disagrees, arguing that the issue reserved by the court was whether a parental prohibition was sufficient, thus obviating the need for an ARP.

It is unclear whether the *Steinbach* court envisioned that a parental prohibition alone, *without* an ARP, could effectively terminate a child's privilege to enter. In order to clarify the law in this area, our discussion, *infra,* assumes that this was the question reserved by the court.

■ We find it significant that the Legislature has given voice to this concern by making any person who is able to provide support and who "[w]ilfully omits to provide necessary food, clothing, shelter, or medical attendance to a child dependent upon him or her . . . guilty of the crime of family nonsupport." RCW 26.20.035(1)(a). The public policy concern for providing children with basic needs mitigates against allowing a parent to unilaterally terminate a child's right of entry into the parental home.

The State contends that an express parental order should be sufficient to terminate the child's privilege to enter, arguing that public policy concerns for a child's welfare would be met by permitting the child to raise a necessity defense. This "solution" would saddle the criminal justice system with the difficult task of balancing competing policies on a case–by–case basis—a task for which it is ill equipped.

■ We believe it is more efficient and appropriate to require parents to meet their obligation to provide some alternative provision for the child's care by obtaining a court order which clearly and unequivocally determines the child's right to enter the home. An ARP under RCW 13.32A or other appropriate court order would satisfy society's need to be assured that provisions have been made for the child's care and, at the same time, would ensure that the parent is also protected.[5] Thus, we hold that a formal legal proceeding is required before a child's privilege to

---

[5]We are aware of the fact that Division Two of this court has recently taken a different approach. In *State v. Howe,* 57 Wn. App. 63, 69, 786 P.2d 824 (1990), the court held that the child's right to enter the home continues "until such time as the child is emancipated or legal custody is placed in someone other than the parent."

We disagree with this conclusion. Determining whether a child is "emancipated" will invariably involve the courts since this often requires resolution of close factual questions. On the other hand, we see no reason to require the extreme remedy of a change of legal custody in order for the child's privilege to be revoked. An ARP provides a cooling off period between parent and child which, in our view, not only permits but envisions the temporary suspension of the child's right to enter his parent's home.

enter the parental home can be terminated. Such a proceeding is necessary to ensure that a dependent child has some lawful place to seek shelter. While we recognize that an older child might not need this degree of protection, we can conceive of no other way to protect younger, more vulnerable children who are the victims of neglectful parents.

In light of parental obligations and the nature of the parent–child relationship, we do not believe that requiring a formal court order places an undue burden on parents. In many cases, parents may well choose not to obtain a court order and simply make some practical alternative provision for an unruly child. For example, parents might place the child with a relative or with parents of a friend of the child. Our holding simply requires that for purposes of a burglary conviction, a judicial order dispossessing the child is necessary in order to satisfy the element of "unlawful entry."

## IV

The State lastly argues that even if Michael remained privileged to enter the home, the privilege did not extend to his mother's bedroom. Thus, the State argues, Michael's conviction for second degree burglary may be upheld because the entry into the bedroom was unlawful.

The State relies on *State v. Rio*, 38 Wn.2d 446, 230 P.2d 308, *cert. denied*, 342 U.S. 867, 96 L. Ed. 652, 72 S. Ct. 106 (1951), in which a tenant argued that his entry into his landlord's bedroom could not support a burglary conviction. The area to which the tenant had free access was limited. He had a room in the home, had free use of the washroom and hallways, but was not otherwise given the run of the house. Under these facts, the court held that the fact that the tenant was living in one part of the house did not preclude his conviction for burglary. *Rio*, 38 Wn.2d at 451.

We believe that it is unnecessary and unwise to extend *Rio* to the facts presented here. If the act of taking money from his mother's bedroom was a theft, the State could have charged Michael with this offense regardless of where

it occurred. Thus, we decline to enter into a room–by–room analysis of the scope of a child's privilege to enter the parental home.

Reversed.

SWANSON, J. (concurring)—I concur in the result because Michael's mother failed to make any reasonable arrangement to provide food and shelter for her 16–year–old son when she expelled him from the home and prohibited him from reentering. I disagree that a formal legal proceeding is necessary before a child's privilege to enter the parental home can be terminated. The parents' obligation of support can be satisfied without a court hearing to either establish or approve provisions for the child's care.

However, I am not willing to go as far as the dissent suggests and separate the parents' withdrawal of the privilege to enter the family home from their statutory duty to support a minor child.

Here no provision was made for the child's care; consequently, the withdrawal of the privilege to enter the home was ineffective.

SCHOLFIELD, J. (dissenting)—The issue in this case is whether Michael Walsh is guilty of burglary and criminal trespass as found by the trial court. The resolution of that issue depends on whether Michael had a right or privilege to enter his mother's home at the time of the alleged offenses. If he did, his entries could not be unlawful, and he would not be guilty of the charged offenses.

In *State v. Steinbach*, 101 Wn.2d 460, 679 P.2d 369 (1984), the decision clearly was based on the fact that Terri Steinbach was not absolutely prohibited by her mother from entering the family home, nor was any such prohibition set forth in the alternative placement order under which she was living at the time. For that reason, the court said her entry into her mother's home was privileged and, therefore, not unlawful.

Judge Pekelis' opinion in the case sub judice acknowledges, as it must, that Michael Walsh was clearly prohibited from entering his mother's home. She told him so and enforced her decision by changing the locks on the doors. The trial court entered a finding that Michael was prohibited from entering his mother's home. Thus, the missing ingredient in the *Steinbach* case is present here. Michael's convictions for burglary and criminal trespass can be affirmed based upon the reasoning of *State v. Steinbach, supra*.

I disagree with Judge Pekelis' opinion because I believe that it engages in impermissible judicial legislation. There is no inherent or irreconcilable conflict between a parent's duty to support minor children and, at the same time, extending a right or privilege to a parent to exclude a minor child from the family home. While Judge Pekelis' opinion provides a solution which is solicitous of the juvenile defendant, it fails to recognize that the problems faced by parents with unmanageable children can become extremely serious.

The facts of this case demonstrate why Lucille Walsh took the extraordinary step of expelling her 16–year–old son Michael from her home. Her job required frequent out–of–town travel. She described one incident in early October 1987 in which 50 to 150 people attended a keg party at her house. The result was that police were called, and furniture was seriously damaged. Michael would also leave the house unlocked so that his friends could enter. On October 23, the rear door was pried open with a crowbar. On one occasion, Michael had threatened her, and she was in a position where she could not control him. She took the action as a disciplinary measure and to protect her home from further damage.

Because a parent has a duty to support a minor child, Judge Pekelis' opinion holds that a parent cannot unilaterally terminate a minor's right of entry into the home of his parents. Judge Pekelis' opinion holds at pages 495–96 "that

a formal legal proceeding is required before a child's privilege to enter the parental home can be terminated." Since there is no irreconcilable conflict between the duty of support and withdrawal of the privilege to enter the family home, this case does not present a need for judicial reconciliation of two conflicting statutes. A minor can be barred from entry into the family home without the duty of support being breached. Judge Pekelis' opinion would make a drastic change in the law in that it would take away from parents the right to bar unmanageable minors from the family home and place that power exclusively in a court. While this judicial distrust of parents may ultimately prove to be justified, I suggest that such a drastic change in the law is properly a legislative function. In the legislative process, research can be done on the advantages and disadvantages of such a rule, knowledgeable people can testify in legislative hearings held by the appropriate committees, and the wisdom of the rule can be thoroughly debated before it becomes law. One of the aspects of the issue that would undoubtedly interest the Legislature would be the extremely difficult position of a parent subjected to the tyranny of an unmanageable teenager during the time that the "formal legal proceeding" was being scheduled and held.

It is unnecessary for this court to make such basic changes in the law in order to resolve the issues in this case. Whether Mrs. Walsh breached her duty to support her son is an entirely separate issue to be dealt with through appropriate process in the appropriate forum. It is not necessary to deny her the right to protect herself from an unmanageable son simply because she has a statutory duty to support him. These are separate issues to be dealt with separately, and there is no basis for a judicial assumption that they must be dealt with in the same proceeding.

On February 22, 1990, Division Two of the Court of Appeals filed an opinion in the case of *State v. Howe,* 57 Wn. App. 63, 786 P.2d 824 (1990). Dealing with the identical issue, the opinion in *Howe* holds that the duties owed

by a parent toward a minor child and the rights of the child derived therefrom "continue until such time as the child is emancipated or legal custody is placed in someone other than the parent." *Howe,* at 69.

Then in apparent recognition of the problems to be faced by parents with unmanageable children, the court acknowledged that parents have a right of possession in their home superior to that of the child. The court went on to say that parents are not required to submit to the tyranny of a minor child and that when faced with such circumstances, "the parent may very well have the right to limit or even deny the child's entry into the home." *Howe,* at 70. The court stated, however, that even under such circumstances, if the child should gain entry to the home, the entry would not be an unlawful entry, and he could not be prosecuted for burglary or criminal trespass. Thus, the *Howe* opinion acknowledges the difficult position of the parent and acknowledges the parent's right to bar the child from the home, but at the same time, advises the parent that if the child breaks into the home anyway, the child cannot be prosecuted on any theory requiring an unlawful entry.

The somewhat ambiguous resolution of the problem in the *Howe* case and the rather drastic changes in the law that Judge Pekelis' opinion would adopt in the case sub judice makes it all the more evident that these cases raise basic societal questions which should be resolved through the legislative process.

It is my view that under existing law and the reasoning underlying the opinion in *State v. Steinbach, supra,* Michael Walsh is guilty of burglary and criminal trespass, and his convictions for those offenses should be affirmed.

Review granted at 115 Wn.2d 1002 (1990).